UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITHERM FOOD SYSTEMS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-0154-CVE-TLW |
| | ) | |
| FOSTER POULTRY FARMS, INC., | ) | |
| d/b/a Foster Poultry Farms | ) | |
| | ) | |
| **Defendant.** | ) | |

**MARKMAN ORDER**

This matter comes before the Court for construction of the claims contained in United States Patent No. 7,285,299, entitled "Surface Pasteurization of Cooked Food Products" (the '299 Patent). A hearing was held in this matter on April 6, 2010, pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). Based on a review of the record, the Court hereby construes the '299 Patent as set forth herein below.

**I.**

Claim 1 in the '299 Patent is:

A method of surface pasteurizing, already cooked food products wherein each of said already cooked food products has an outer surface, an internal core, and an internal core temperature, said method comprising the steps of:

(a) continuously heating said already cooked food products in a manner effective to take said outer surface to a temperature of at least 155º F.;

(b) then, after step (a), placing said already cooked food products in packages;

(c) then, after step (b), continuously heating said packages of said already cooked food products using water in a manner effective to take said outer surface to a temperature of at least 155º F.; and

(d) then, after step (c), continuously cooling said packages of said already cooked food products,

> wherein, except for any incidental heat loss which occurs in conducting said already cooked food products from step (a) to step (b) and from step (b) to step (c), no intervening cooling procedure is performed between step (a) and step (b) and no intervening cooling procedure is performed between step (b) and step (c),
>
> wherein, for each of said already cooked food products, step (a) has a beginning, step (d) has an end, and said internal core temperature at said beginning of step (a) is a beginning core temperature, and
>
> wherein steps (a), (b), (c), and (d) are conducted in a manner effective to prevent said internal core temperature from rising to more than 10º F. above said beginning core temperature at any time from said beginning of step (a) to said end of step (d).

'299 Patent, col. 10, lns. 31-62.  Claim 7 is:

> The method of claim **1** wherein steps (a), (b), (c), and (d) are conducted in a manner effective such that no substantial increase in said internal core temperature above said beginning core temperature occurs at any time from said beginning of step (a) to said end of step (d).

'299 Patent, col. 11, lns. 18-23.

## II.

A patent consists of a specification, which includes a detailed description of the invention and the drawings, and one or more claims that appear at the end of the patent. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 111, 1115 (Fed. Cir. 2004)).  Determination of patent infringement is a two-step process.  First, the court must construe the patent claims.  Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998); Strattec Sec. Corp. V. Gen. Auto. Specialty Co., 126 F.3d 1411, 1416 (Fed. Cir. 1997); Markman, 52 F.3d

at 976.  Second, the construed claims are compared to the allegedly infringing device or process.[1]  E.g., Cybor Corp., 138 F.3d at 1454.

The words and phrases used in claims must be clear, exact, and precise.  Claims must also "particularly point[] out" and "distinctly" claim the invention.  35 U.S.C. § 112.  The claim requirements of 35 U.S.C. § 112 must be adhered to strictly for purposes of enabling the public to determine what subject matter is, and what subject matter is not, within the scope of the monopoly granted by the United States government.  That subject matter which has not been made the subject of the patent monopoly is free territory to be practiced by everyone in the general public.  The public is entitled to rely on the public record, apply the established rules of claim construction, ascertain the scope of the patent, and attempt to design around it.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996).  Because the public relies on the claims, it is "unjust to the public, as well as an evasion of the law, to construe [claims] in a manner different from the plain import of [their] terms."  White v. Dunbar, 119 U.S. 47, 52 (1886) (quoted in Phillips, 415 F.3d at 1312).

The words of a claim are to be given their "ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ."  Phillips, 415 F.3d at 1313; see also Vitrionics, 90 F.3d at 1572; Innova, 381 F.3d at 1116.  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood

---

[1] Courts must ignore the defendant's allegedly infringing device or process when construing claim terms.  Only after the claims have been properly construed without any consideration of the alleged infringement, may the construed claims be applied to the defendant's device or process.  SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985).

words. In such circumstances, general purpose dictionaries may be helpful." Phillips, 415 F.3d at 1314. However, in cases where the intended meaning is not apparent, courts look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," Innova, 381 F.3d at 1116, including the patent specifications and the prosecution history. See ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed. Cir. 2009); Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("[w]e cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history") (quoting DeMarni Sports, Inc. v. Worth, 239 F.3d 1314, 1324 (Fed. Cir. 2001)). The language, specifications, and prosecution history, collectively, are referred to as "intrinsic evidence."

The patent specifications are relevant to claim construction because the claims are part of "a fully integrated written instrument." ICU Medical, 558 F.3d at 1374 (quoting Phillips, 415 F.3d at 1315). "Thus not only is the written description helpful in construing claim terms, but it is also appropriate 'to rely heavily on the written description for guidance as to the meaning of the claims.'" Id. (quoting Phillips, 415 F.3d at 1317). Although the specifications may be helpful in construing the terms of a claim, specifications do not necessarily limit claims' scope if the claims are written in broad language. Innova, 381 F.3d at 1117 ("particular embodiments appearing in the written description will not be used to limit claim language that has broader effect . . . even where a patent describes only a single embodiment, claims will not be 'read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope . . .'") (quoting Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)).

The prosecution history is relevant because it "provides evidence of how the [United States Patent and Trademark Office] and the inventor understood the patent." Phillips, 415 F.3d at 1317. Although it is "less useful [than the specifications] for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. If the patentee unequivocally disclaimed a certain meaning during the patent approval process, the claim must be narrowed to exclude that meaning. Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005). This ensures that claims are not construed one way in order to gain approval and another way against accused infringers. Id.

Although the Federal Circuit has emphasized the importance of intrinsic evidence in claim construction, district courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1318 (quoting Markman, 52 F.3d at 980). "While extrinsic evidence 'can shed useful light on the relevant art,' . . . it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" Id. (quoting C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004)).

In the end,

> there is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence. For example, a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term. The sequence of steps used by the judge in consulting various sources is not

5

> important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.

Id. at 1323 (internal citations omitted).

### III.

Applying the legal principles set forth above to the words and phrases identified by the parties[2] for construction, the Court hereby construes claims in the '299 Patent as follows:

1. The term "**no substantial increase in said internal core temperature**" in claim 7 is construed as: "**an increase in internal core temperature of no more than 1° F.**" The parties agreed upon this construction. Dkt. # 46.

2. The term "**continuously heating**" in claim 1 is construed as: "**heating without interruption**."[3] Plaintiff argues that this term did not require construction or, in the alternative, that the term be construed as "[a] process step in which the product pieces are heated as the product pieces are being carried in a continuous manner along a path of travel by a conveyor or other carrying system." Dkt. # 49, at 1. Defendant argues that the term should be construed as "[h]eating the product at a constant heating temperature." Dkt. # 51, at 16. By its plain meaning, this term refers to the manner and duration of heating, rather than the temperature at which products are heated. This is consistent with the language of the dependent claims, for example where "products are continuously heated . . . by

---

[2] The parties agreed that one term required construction, and defendant argued that four additional terms required construction. The Court finds that all five terms require construction.

[3] Although defendant did not specifically request claim construction of the term "**continuously heated**" in dependent claim 11, it follows that "**continuously heated**" is "**heated without interruption**."

6

continuously conducting said already cooked food products through an interior of a heating apparatus . . . ." '299 Patent, col. 12, lns. 10-12. The specifications clearly contemplate applications in which the products are conducted through a heating or cooling apparatus. Further, the specifications focus primarily on the temperature of the products, rather than the temperature of the heating or cooling apparatus. Defendant argues that plaintiff described "continuously heating" as "heating at a constant temperature" during prosecution of the patent. Dkt. # 51, at 16. Plaintiff distinguished prior art, the Cygnarowicz-Provost (Provost) publication, by stating that "the pasteurization process in [Provost] does not take place at a constant temperature," Dkt. # 51-5, at 15, and the Provost procedure "was not a continuous process and . . . did not involve either steady state conditions or the use of a constant treatment temperature," Dkt. # 51-8, at 14. The Court finds that use of the term constant temperature to distinguish prior art in the prosecution history of the '229 Patent was not an unequivocal disclaimer of a meaning that does not require a constant temperature. Therefore, the claim need not be narrowed to include the requirement of a constant temperature. See Chimie, 402 F.3d at 1384.

3. The term "**continuously cooling**" in claim 1 is construed as: "**cooling without interruption**." For the same reasons as 2, supra, this construction is consistent with the plain language of the claim and patent specifications.

4. The term "**incidental heat loss**" in claim 1 is construed as: "**atmospheric or other ambient heat loss**." Plaintiff argues that this term did not require construction or, in the alternative, that it be construed as "[a]ny heat which is surrendered to the atmosphere air in the processing facility or which is otherwise removed from the product during ambient

temperature processing." Dkt. # 49, at 5. Defendant argues that this term should be construed as "heat incidentally lost to the atmosphere as the product is conveyed directly between step (a) and step (b), and directly between step (b) and step (c)." Dkt. # 51, at 19. From the language of the claim and the specifications in the patent, it is clear that the term is intended to describe heat incidentally radiated to the product's surroundings after it is heated in step (a) or step (c). The prosecution history shows that plaintiff intended this term to describe the product's natural loss of heat, rather than a procedure by which the product is cooled. See Dkt. # 51, at 20-21. For example, if a product were permitted to sit idle after passing through a heating oven, the heat it would lose would be incidental heat loss. Defendant's requested insertion of the word "directly" would introduce an unintended limitation into claim 1, as the claim does not require that the product travel directly between steps of the process, only that there be no intervening cooling procedure between steps.

5. The term "**intervening cooling procedure**" in claim 1 is construed as: "**cooling of the product between step (a) and step (b) or between step (b) and step (c) that is not 'incidental heat loss.'**" This is defendant's proposed construction. Dkt. # 51, at 19. Plaintiff's proposed construction is "[a]n interventional step, different from ambient temperature processing of the product, wherein a product cooling system is used for the purpose of bona fide heat removal." Dkt. # 49, at 5. The Court finds that its construction of the term has the same meaning as plaintiff's, but would be less confusing for a jury.

**IT IS SO ORDERED** this 7th day of April, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

8